[Cite as *State v. Stuart*, 2020-Ohio-3239.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2018-L-145** |
| DONALD J. STUART, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 2013 CR 000432

Judgment: Affirmed.

*Charles E. Coulson*, Lake County Prosecutor, *Alexandra Kutz* and *Jennifer A. McGee*, Assistant Prosecutors, 105 Main Street, P.O. Box 490, Painesville, Ohio 44077 (For Plaintiff-Appellee).

*Vanessa R. Clapp*, Lake County Public Defender and *Melissa A. Blake,* Assistant Public Defender, 125 East Erie Street, Painesville, Ohio 44407 (For Defendant-Appellant).

MARY JANE TRAPP, J.

{¶1} Appellant, Donald J. Stuart ("Mr. Stuart"), appeals his convictions for rape, kidnapping, sexual battery, and menacing by stalking following a jury trial in the Lake County Court of Common Pleas.

{¶2} Mr. Stuart raises seven assignments of error on appeal. He argues that: 1) the trial court improperly excluded evidence of the victim's prior sexual abuse pursuant to the rape shield statute, R.C. 2907.02; 2) the trial court improperly admitted evidence of

Mr. Stuart's other acts, more specifically, his "grooming and manipulation" behaviors towards the victim; 3) the trial court improperly allowed the state's expert witness to testify; 4) the trial court erred in denying his motion to suppress; 5) the evidence was legally insufficient to prove his convictions; 6) the manifest weight of the evidence does not support his convictions; and, lastly, 7) his right to a speedy trial was violated.

{¶3} We affirm the judgment of the Lake County Court of Common Pleas, finding that: 1) the trial court properly excluded evidence of the victim's prior sexual abuse as it was highly prejudicial and immaterial; 2) the trial court properly admitted evidence of Mr. Stuart's other acts of grooming and manipulation as it was directly relevant and part of the offenses charged; 3) the state's expert properly testified about child sexual abuse victims and their common delay in reporting, as well as grooming and manipulation behaviors, all of which is knowledge outside of the common layperson; 4) the trial court properly overruled Mr. Stuart's motion to suppress because he was not subjected to a custodial interrogation; 5) Mr. Stuart failed to make a sufficiency of the evidence argument, instead arguing as to the credibility of the victim witness; however, the state introduced sufficient evidence from which the jury could find Mr. Stuart guilty of rape, kidnapping, sexual battery, and menacing by stalking; 6) the manifest weight of the evidence is heavily in favor of the jury's verdict; and, lastly, 7) Mr. Stuart knowingly and voluntarily filed a written waiver of his rights to a speedy trial, and the time between his withdrawal of his waiver and the trial date was neither lengthy nor prejudicial.

**Substantive and Procedural History**

{¶4} On June 12, 2013, Detective Colleen Petro ("Detective Petro") from the Mentor Police Department received information that another officer was taking a sexual

2

assault report from a minor child victim against her adoptive father. The victim, "J.S.," who was 15 years old, alleged that Mr. Stuart made inappropriate and sexual comments and sexually assaulted her.

{¶5} J.S. disclosed the abuse to a friend, and together they contacted Lake County Job & Family Services ("LCJFS") during the school day. A representative from LCJFS was also at the high school when Detective Petro arrived. Another detective informed Detective Petro that Mr. Stuart had been calling the high school all day because J.S. did not take the bus to school and he was worried she was missing. Detective Petro decided to take J.S. to the police station to make a statement.

### *The Monitored Call*

{¶6} When they arrived at the station, the detective asked J.S. if she would be willing to make a monitored phone call to Mr. Stuart. J.S. agreed, and with Detective Petro's assistance, she called Mr. Stuart. J.S. told him she was with her friend, "Halle," and then asked him why he would abuse her, specifically mentioning the instances of rape and the sexual comments he made to her. Mr. Stuart denied her allegations, and at times, apologized, saying, "it was wrong," and also saying said he could not recall what happened and "anything is possible."

{¶7} Mr. Stuart was coincidentally already at the Mentor Police Department when J.S. and Detective Petro were calling him. When J.S. did not get dropped off by the bus after school, he decided to go to the station and file a missing person report. There is a video of Mr. Stuart in the lobby talking on his cellphone, presumably to J.S.

### *The Mentor Police Department Interview*

3

{¶8} When the call concluded, Detective Petro located Mr. Stuart in a downstairs interview room and asked him if he would be willing to discuss J.S.'s whereabouts with her and another officer, Detective Jim Collier. Before Detective Petro began the interview, she gave Mr. Stuart a written form detailing his Miranda rights. Mr. Stuart asked her if he should call his lawyer while simultaneously pulling his cell phone out of his pocket. Detective Petro informed Mr. Stuart it was up to him but that "he came here on his own." The reason she was gave him the form was "he [Mr. Stuart] had a lot of stuff going on in the court right now" and she "figured she's just going to cover herself. I'm a police officer." When asked if he would initial the form that she read and if he understood his rights, Mr. Stuart replied that he would initial the form but that he was going to call his attorney. Detective Petro replied, "Okay. Why did you come in today?"

{¶9} The videotape showed Mr. Stuart calling and texting his attorney, while Detective Petro inquired about J.S.'s disappearance and the last time he communicated with her. He willingly responded to her questions. When Mr. Stuart indicated he had just received a call from J.S., Detective Petro began to inquire of the specifics of his conversation. Mr. Stuart again attempted to call his attorney and ultimately left a message. Mr. Stuart continued to respond to the detective's questions but did not reveal the topic of his conversation with J.S.

{¶10} Mr. Stuart told the detectives that J.S. told the truth 90% of the time but that when she did not, the lies were "way out there." He then informed them that he was initially the foster parent of J.S. and her four biological brothers and sisters. Mr. Stuart and his wife, Sharon ("Mrs. Stuart"), adopted the children at different times over the years, adopting J.S. when she was eight. He also told them that J.S. had "RAD," or reactive

attachment disorder, and he detailed her early history, which included several different foster placements and prior sexual abuse. One of the abuse allegations was against her brother, who sexually abused J.S. in the Stuart's home. The brother was removed from the Stuart's home by LCJFS. LCJFS subsequently charged the Stuarts with neglect. Those charges were pending at the time of the interview.

{¶11} The interview progressed, with the detectives asking questions about J.S., the problems she was currently facing, and what she said during their "twenty-minute" phone call. Mr. Stuart did not share the details of the call. The detectives then disclosed that they knew J.S. had made sexual allegations against him and asked if he would like to help them "understand the situation."

{¶12} Mr. Stuart replied that he needed his attorney and tried calling his attorney once more. The detectives asked him several more questions, to which Mr. Stuart did not answer. Once Mr. Stuart repeated that he wanted to speak to his attorney, the interview concluded, and both detectives left the room. Mr. Stuart was arrested shortly thereafter.

***Pretrial Matters***

{¶13} The case was bound over from the Mentor Municipal Court to the Lake County Court of Common Pleas, where Mr. Stuart was indicted by the grand jury on eight counts: 1) rape, a first degree felony, in violation of R.C. 2907.02(A)(2); 2) kidnapping, a first degree felony, in violation of R.C. 2905.01(A)(4); 3) kidnapping, a first degree felony, in violation of R.C. 2905.01(A)(2); 4) & 6) two counts of rape, a first degree felony, in violation of R.C. 2907.02(A)(1)(c); 5) & 7) two counts of sexual battery, a third degree

5

felony, in violation of R.C. 2907.03(A)(5); and lastly, 8) menacing by stalking, a fourth degree felony, in violation of R.C. 2903.211(A)(1).

{¶14} On December 17, 2013, Mr. Stuart signed a speedy trial waiver, waiving his statutory and constitutional rights to a speedy trial. Mr. Stuart also filed a motion to suppress any and all statements obtained from him as a result of the interview conducted by the Mentor Police Department, arguing the interview was a custodial interrogation. In turn, the state filed a response, arguing the interview was not a custodial interrogation because Mr. Stuart was voluntarily at the police station, he was free to leave at any time, and he never made an unequivocal or unambiguous request for counsel. A hearing on the motion to suppress was held on March 14, 2014.

{¶15} In 2014, Mr. Stuart filed two motions for continuances of the jury trial, citing discovery and depositions that still needed to be conducted. Numerous motions for discovery were filed by both Mr. Stuart and the state. During 2016 through 2018, the state filed several motions for a status hearing and to set a date for trial because considerable time was passing.

### The Court's Ruling on Mr. Stuart's Motion to Suppress

{¶16} In a judgment entry issued on June 25, 2018, the court denied Mr. Stuart's motion to suppress, finding that Mr. Stuart was not in custody at the time he was interviewed by the Mentor Police Department. Mr. Stuart voluntarily came to the station and initiated the contact, he was never arrested, handcuffed or restrained, and he was able to make and receive telephone calls and text messages. The court noted that Mr. Stuart was offered and provided with a beverage of his choice and that he spent most of the interview speaking about the subject that motivated him go to the Mentor Police

6

Department in the first place, i.e., his daughter not coming home from school. Mr. Stuart had no idea he was suspected of criminal wrongdoing, and there was no evidence that he wanted to leave or was prevented from doing so. Lastly, Detective Petro testified at the hearing that she did not decide to arrest Mr. Petro until shortly before the interview was concluded.

### Motion to Discharge for Speedy Trial Right Violation

{¶17} On July 5, 2018, the court set the matter for a jury trial to begin on August 21. Soon after, on July 18, 2018, Mr. Stuart filed a motion to discharge for violation of his right to a speedy trial. The state, in opposition, noted that Mr. Stuart expressly waived his right to a speedy trial in a written waiver of time that did not contain a time limit, and was therefore, unlimited. Mr. Stuart then filed a motion for a continuance of the jury trial on August 13, which the court granted, setting the trial for October 30, 2018.

{¶18} The court ruled on Mr. Stuart's motion to discharge several weeks later, denying the motion. The court noted that Mr. Stuart knowingly and voluntarily executed and filed a written waiver of time that reserved only the right to challenge any pre-arrest and/or pre-charge delay without any other restrictions or time limit. Further, Mr. Stuart never formally withdrew his waiver of time and never filed a demand for trial. Thus, Mr. Stuart's waiver was still in effect at the time he filed his motion to dismiss his case on speedy trial grounds. Construing his motion to discharge as a formal withdrawal of his waiver, the trial court examined the time between the "withdrawal" and the date of trial. The court found that the length of the delay was only 34 days between Mr. Stuart's withdrawal of his speedy trial waiver and the date set for trial, which was not prejudicial,

7

especially in light of the fact that the defense indicated it would not be prepared to try the case by that date.

### *Motions in Limine*

{¶19} The state filed several motions in limine to present evidence of Mr. Stuart's other acts. One dealt with the prior sexual activities/abuse Mr. Stuart engaged in with a minor when he, himself, was a minor. The subject of the state's second motion in limine dealt with the grooming and manipulative behaviors he advanced toward J.S. The state's third motion sought to preclude the defense from presenting any evidence of the minor victim's prior sexual abuse history.

{¶20} The defense also filed several motions in limine to preclude the state's expert from testifying about sexually abused children and to prevent the state from mentioning Mr. Stuart's bond conditions, which prohibited him from residing with his wife and children.

{¶21} First, the court overruled the defense's motion in limine to preclude the state's expert from testifying. The court found that if the state was able to establish at trial that their expert, Diane Daiber, a sexual abuse nurse examiner ("SANE"), was qualified as an expert, then her testimony would be admissible to aid the jury in understanding the evidence. The court reasoned that the state was not calling her as a witness to offer an opinion as to the truthfulness of the victim or whether the victim was sexually abused but to testify that the victim's behavior as an alleged child victim of sexual abuse was consistent with behavior observed in sexually abused children, which is admissible under the Ohio Rules of Evidence.

8

{¶22} The court also overruled the state's first motion in limine, finding that any evidence that the state wanted to introduce of alleged sexual abuse of a minor victim that occurred over thirty years ago, when Mr. Stuart was himself a minor, was not relevant and not admissible.

{¶23} Third, the court granted Mr. Stuart's motion in limine to prohibit the state from introducing any evidence or testimony or making any comments concerning Mr. Stuart's bond conditions.

{¶24} Prior to the jury trial, the court spoke with both attorneys on the record as to the state's motion in limine pursuant to R.C. 2907.02(D) regarding the victim's prior sexual abuse history. The court granted the state's motion, finding that the rape shield statute precluded any sexual activity of a victim, whether consensual or nonconsensual, from being introduced. The trial court found there were no allegations that the victim made false accusations. Moreover, it found that the evidence of the prior sexual abuse the defense sought to introduce was unrelated and inadmissible.

### *Trial and Sentencing*

{¶25} A jury trial was held over nine days. The state presented the testimony of several officers from the Mentor Police Department, the victim, J.S., J.S.'s social worker from LCJFS, and Diane Daiber, the SANE expert witness. The defense presented the testimony of Mrs. Stuart, a woman with whom J.S. was placed after she left the Stuarts, a family friend and owner of a teashop where J.S. worked several days a week during the time of the incident, a parent of J.S.'s friend, a licensed private investigator who analyzed the Stuart's home and compared it with J.S.'s version of events, and Mr. Stuart himself.

{¶26} The jury returned a guilty verdict on all eight counts, and the matter was deferred for sentencing until November 28, 2018. At sentencing, the trial court found that Counts 2 and 3 merged with each other and with Count 1; Count 5 merged with Count 4; Count 7 merged with Count 6; and Count 8 did not merge. The state elected to proceed to sentencing on Count 1 (rape), Count 4 (rape), Count 6 (rape), and Count 8 (menacing by stalking). Mr. Stuart was found to be a Tier III Sex offender with a duty to register and was sentenced to a stated prison term of ten years on Count one, six years on Count 4, six years on Count 6, and 12 months on Count 8. The prison terms imposed on Count 4 and Count 6 were ordered to be served concurrent to one another and consecutive to Count 1. The prison term imposed on Count 8 was ordered to be served concurrent to the prison terms imposed on Count 1, Count 4, and Count 6. The total term of imprisonment imposed was 16 years.

{¶27} Mr. Stuart now appeals, raising seven assignments of error:

{¶28} "[1.] The trial court's application of Ohio's rape shield statute, R.C. 2907.02(D), violated the defendant-appellant's constitutional rights to fair trial, confrontation and due process as guaranteed by the Fifth, Sixth and Fourteenth amendments to the United States Constitution and Article I Sections 10 and 16 of the Ohio Constitution.

{¶29} "[2.] The defendant-appellant was deprived of his rights to a fair and impartial trial and due process under the Fourteenth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution when the trial court allowed the state to introduce evidence of his alleged 'prior bad acts.'

10

{¶30} "[3.] The trial court violated the defendant-appellant's constitutional rights to fair trial and due process, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I Sections 10 and 16 of the Ohio Constitution, when it permitted the SANE nurse to testify as an expert witness.

{¶31} "[4.] The trial court erred when it denied the defendant-appellant's motion to suppress in violation of his due process rights as guaranteed under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and Section 10, Article I of the Ohio Constitution.

{¶32} "[5.] The trial court erred to the prejudice of the defendant-appellant when it denied his motion for acquittal made pursuant to Crim.R. 29(A).

{¶33} "[6.] The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence.

{¶34} "[7.] The trial court erred in denying the defendant-appellant's motion to discharge for violation of defendant's right to a speedy trial, thus violating the defendant-appellant's constitutional and statutory rights to a speedy trial."

**Admissibility of the Victim's Prior Sexual Abuse**

{¶35} In his first assignment of error, Mr. Stuart contends the trial court erred in applying Ohio's rape shield statute, R.C. 2907.02(D), to exclude evidence of the minor victim's prior sexual abuse, thus violating his constitutional rights to a fair trial, confrontation, and due process as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

11

{¶36} More specifically, Mr. Stuart wanted to introduce evidence that J.S. had been previously adjudicated an abused child in juvenile court prior to her adoption by the Stuarts and that she was in fear of her brother, who had sexually abused her in the Stuart's home. Mr. Stuart argued that the rape shield statute only excludes consensual sex and that evidence of nonconsensual sex is admissible. He further argued the evidence was probative to show J.S. had prior knowledge of anal rape and to show her delayed reporting in this instance against Mr. Stuart differed from her immediate reporting of the sexual abuse she suffered from her brother.

{¶37} The court disagreed, finding the victim's prior sexual abuse was inadmissible and, citing the exceptions delineated in R.C. 2907.02(D), the rape shield statute does not distinguish between consensual and nonconsensual sex. We agree.

{¶38} The rape shield law provides that "[e]vidence of specific instances of the victim's sexual activity * * * shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, the victim's past sexual history with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value." R.C. 2907.02(D); *State v. Egli*, 11th Dist. Portage No. 2007-P-0052, 2008-Ohio-2507, ¶51.

{¶39} In deciding whether the trial court was warranted in excluding evidence of the victim's prior sexual abuse, we are mindful that "[t]he evidentiary determination of a trial court under R.C. 2907.02(D) should not be disturbed on appeal absent a showing of an abuse of discretion * * *. The abuse of discretion standard is also used when reviewing a determination by the trial court weighing the probative value of the evidence with its

12

danger of unfair prejudice under Evid.R. 403." *Id.* at ¶52, quoting *State v. Hardy*, 11th Dist. Portage No. 96-P-0129, 1997 WL 665979, *14-15 (Oct. 10, 1997). An abuse of discretion is a term of art, "connoting judgment exercised by a court which neither comport with reason, nor the record." *State v. Underwood*, 11th Dist. Lake No. 2008-L-113, 2009-Ohio-2089, ¶30, citing *State v. Ferranto*, 112 Ohio St. 667, 676-78 (1925). Stated differently, an abuse of discretion is the trial court's "'failure to exercise sound, reasonable, and legal decision-making.'" *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶62, quoting *Black's Law Dictionary* 11 (8th Ed.Rev.2004).

{¶40} The evidence defense counsel sought to introduce did not relate to the origin of semen, pregnancy, or disease or the victim's past sexual history with Mr. Stuart. Rather, defense counsel attempted to introduce evidence of the victim's prior sexual abuse to show an alternative source of knowledge of anal rape. Defense counsel also sought to introduce evidence of J.S.'s immediate disclosure of the sexual abuse she suffered from her brother, while in the case of Mr. Stuart, she made a delayed disclosure.

{¶41} We do not find that the trial court abused its discretion in excluding this evidence. "[T]he purpose of the rape shield law [is] to protect the victim from harassment and to discourage the tendency in rape cases to try the victim rather than the defendant." *Egli* at ¶54, quoting *State v. Archibald,* 11th Dist. Lake Nos. 2006-L-047 & 2006-L-207, 2007-Ohio4966, ¶52; *State v. Gardner*, 59 Ohio St.2d 14, 17 (1979). It was certainly within the court's discretion to exclude such evidence.

{¶42} We also do not find persuasive Mr. Stuart's argument that the rape shield only applies to consensual prior sexual acts and that nonconsensual sexual abuse is admissible. While this case has been pending on appeal, the Supreme Court of Ohio

13

decided this very issue, thus rendering this portion of Mr. Stuart's argument meritless. In *State v. Jeffries*, Slip Opinion No. 2020-Ohio-1539, the court expressly held that "the plain meaning of the term 'sexual activity' as used in the rape-shield law includes *both consensual and nonconsensual sexual activity and that both are barred from admission into evidence* by the rape-shield law, absent one of the specific exceptions listed in the law." (Emphasis added.) *Id.* at ¶30.

{¶43} Citing to *In re Michael*, 119 Ohio App.3d 112 (2d Dist.1997), Mr. Stuart also argues that evidence of J.S.'s prior sexual abuse should have been admissible as an exception under the rape shield statute because it showed "an alternative source" of the "victim's knowledge of sexual conduct or activity." The facts of *In re Michael*, however, are markedly different, in that the victim was only 8 years of age. Thus, the Second Appellate District held that a trial court's exclusion of all evidence of a victim's prior sexual abuse under those circumstances would be unreasonable and constitute an abuse of discretion. *Id.* at 121.

{¶44} We agree with the Second District's later decision in *State v. Hennis,* 2d Dist. Clark No. Civ.A.2003 CA 21, 2005-Ohio-51, in which the court distinguished its holding in *In re Michael* because the victim teenager was old enough that her sexual knowledge alone was not evidence that she had been sexually abused. *Id.* at ¶50. *See also State v. Black*, 3d Dist. Hardin No. 6-06-08, 2007-Ohio-3133, ¶14-15 (holding that even though the victim was closer in age to the victim in *In re Michael* than *Hennis* and, unlike the victim in *Hennis*, she probably could not have attained sexual knowledge unless she was abused, any prior sexual abuse of the victim was neither probative nor material because of the appellant's own admissions).

14

{¶45} J.S. was fifteen years old and in high school at the time the subject offenses occurred. Thus, "sexual knowledge alone was not evidence that she had been sexually abused." *Black* at ¶14. Further, any delay in reporting versus her immediate reporting of the sexual abuse she suffered from her brother is immaterial and highly prejudicial. The court did allow the defense to cross examine J.S. on a letter she wrote to Mrs. Stuart about the incident with her brother and to elicit testimony that J.S. was afraid of her brother.

{¶46} Lastly, Mr. Stuart argues the trial court should have conducted an in camera hearing so that the court could have questioned the victim regarding her prior sexual abuse. Prior to trial and on the record, the trial court conferenced with the state and defense counsel regarding the state's motion pursuant to R.C. 2907.02(D). The trial court confirmed with both that there was no doubt J.S.'s prior sexual abuse was not false accusations.

{¶47} There is no requirement to hold an in camera hearing of the victim's prior sexual activity per R.C. 2907.02. Pursuant to the Supreme Court of Ohio's holding in *State v. Boggs*, 63 Ohio St.3d 418 (1992), a trial court is only required to conduct an in camera hearing when there is a possibility that the victim made false accusations of sexual abuse or activity to ascertain whether sexual activity was really involved, and, if so, whether cross-examination on the accusation would be prohibited by R.C. 2907.02(D), or whether the accusation was totally unfounded and therefore could be inquired into pursuant to Evid.R. 608(B). *Id.* at paragraph two of the syllabus. *See also State v. Singleton,* 11th Dist. No. Lake No. 2002-L-077, 2004-Ohio-1517, ¶65 ("Assuming there is a good faith basis for the question, a defendant may ask a victim if he or she has

made prior false accusations of sexual activity. Only if the victim responds affirmatively is the court required to conduct an in camera hearing to determine if the prior instances involved sexual activity").

{¶48} Mr. Stuart's first assignment of error is without merit.

**Prior Bad Acts**

{¶49} In Mr. Stuart's second assignment of error, he contends he was deprived of his rights to a fair trial and due process when the trial court allowed the state to introduce evidence of his "alleged bad acts."

{¶50} More specifically, the trial court allowed the state to introduce evidence of Mr. Stuart's "grooming and manipulation" behaviors toward the victim. J.S. testified at trial that Mr. Stuart laid down in bed with her and read her stories, attempted to snuggle with her, showed her pornography, digitally penetrated her for several years before she reached the age of 13, and made inappropriate sexual comments to her. Further, the state's expert on child victim sexual abuse, Ms. Daiber, the SANE nurse, explained to the jury that "grooming" is a term used to describe the manipulative behavior a person engages in to prepare the child for sexual abuse and discourage the child from disclosing the abuse.

{¶51} The general principle that guides admission of evidence is that "[a]ll relevant evidence is admissible * * *." Evid.R. 402. Evid.R. 403 provides exceptions to this general principle and provides circumstances for the exclusion of relevant evidence.

{¶52} Another exception to the principle that all relevant evidence is admissible is Evid.R. 404(B), which provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity

16

therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶53} "Evid.R. 404 codifies the common law with respect to evidence of other acts of wrongdoing. *State v. Lowe,* 69 Ohio St.3d 527, 530 * * * (1994). The rule contemplates acts that may or may not be similar to the crime at issue. *State v. Broom,* 40 Ohio St.3d 277, 282 * * * (1988). If the other act is offered for some relevant purpose other than to show character and propensity to commit crime, such as one of the purposes in the listing, the other act may be admissible. *Id.* Another consideration permitting the admission of certain other-acts evidence is whether the other acts 'form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment' and are 'inextricably related' to the crime. *State v. Curry,* 43 Ohio St.2d 66, 73 * * * (1975). *See also Broom* at 282 * * *.

{¶54} "'The admission of such [other-acts] evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that created material prejudice.' *State v. Diar,* 120 Ohio St.3d 460, 2008-Ohio-6266, * * * ¶66. *See also State v. Sage,* 31 Ohio St.3d 173, * * * (1987), paragraph two of the syllabus ('The admission or exclusion of relevant evidence rests within the sound discretion of the trial court')." *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶11-14.

{¶55} "Evidence that an accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime, or that he acted in conformity with bad character." *State*

*v. Jeffries*, 8th Dist. Cuyahoga No. 105379, 2018-Ohio-162, ¶26, quoting *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, ¶15. There are, however, exceptions that allow other acts of wrongdoing to be admitted. *Id.* at ¶23.

{¶56} Thus, pursuant to R.C. 2945.59, "[i]n any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."

{¶57} Further, Evid.R. 404(B) provides that evidence of other crimes, wrongs, or acts is permitted to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or the absence of mistake or accident.

{¶58} In deciding whether to admit other acts evidence, trial courts should conduct a three-step analysis: (1) consider whether the evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence (Evid.R. 401); (2) whether evidence of the crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose such as those stated in Evid.R. 404(B); and (3) consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice (Evid.R. 403). *Jeffries*, 2018-Ohio-162 at ¶26, citing *Williams* at ¶20.

18

{¶59} Applying this test to the challenged testimony, we find no abuse of discretion by the trial court in admitting this evidence. Firstly, the other acts evidence was relevant because it tended to show Mr. Stuart's plan for grooming J.S. for sexual activity. "'Shaping and grooming describes the process of cultivating trust with a victim and gradually introducing sexual behaviors until reaching the point of intercourse.'" *Id.* at ¶27, quoting *Williams* at ¶21, quoting *United States v. Johnson*, 132 F.3d 1279, 1280 (9th Cir.1997), fn. 2.

{¶60} Secondly, the testimony was elicited for a legitimate purpose under Evid.R. 404(B), which provides that other acts evidence may be admitted to "show motive, intent, plan, scheme and absence of mistake." *Id.* at ¶28.

{¶61} Lastly, the probative value of the evidence was not outweighed by the danger of unfair prejudice. Rather than solely inflaming the jury and appealing only to its emotions, the evidence of Mr. Stuart's grooming of J.S. provided a basis for the jury to recognize his ongoing scheme for sexual activity with J.S. *Id.* at ¶29.

{¶62} We also do not find that the trial court's failure to give a limiting instruction regarding the other acts evidence is plain error. Because Mr. Stuart did not request a limiting instruction, he has waived all but plain error. *Id.* at ¶30, citing *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, ¶136. Nothing suggests the jury used other acts evidence to convict Mr. Stuart "because he was a bad person." *Id.*, citing *Perez* at ¶136. On cross-examination, defense counsel challenged J.S.'s credibility and testimony regarding Mr. Stuart's sexual motives and actions. Moreover, Mr. Stuart testified in his own defense. The jury was free to judge the credibility of the witnesses.

19

{¶63} We do not find the trial court abused its discretion in admitting other acts evidence on grooming and manipulation, nor do we find plain error on the part of the trial court in failing to give the jury a limiting instruction.

{¶64} Mr. Stuart's second assignment of error is without merit.

**Expert Witness**

{¶65} In his third assignment of error, Mr. Stuart contends the trial court erred in allowing the state's expert witness, Ms. Daiber, a SANE nurse, to testify. He argues that her testimony, per Evid.R. 702(A), did not relate to matters beyond the knowledge or experience possessed by lay persons or dispel a misconception common among lay persons, and that it, in fact, misled the jury.

{¶66} "The determination of the admissibility of expert testimony is within the discretion of the trial court. Evid.R. 104(A). Such decisions will not be disturbed absent abuse of discretion." *State v. Cook*, 11th Dist. Lake No. 2016-L-079, 2017-Ohio-7953, ¶40, quoting *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, ¶9.

{¶67} At trial, the state called Diane Diaber, a registered nurse who is certified as a SANE examiner for adolescents, adults, and pediatrics. Ms. Diaber has over fifteen-years' experience in the field, works exclusively in this area, and prior to obtaining her certification, worked for over 300 hours as a sexual assault nurse examiner as part the certification requirements.

{¶68} Ms. Diaber explained grooming and manipulation behaviors that are common in child sexual abuse and why child victims tend to delay reporting.

{¶69} We find no abuse of discretion in the trial court's inclusion of Ms. Daiber's testimony. Ms. Diaber was a qualified expert, pursuant to Evid.R. 702. Moreover, as we

20

held in *Cook*, "the fact that delayed reporting by sexual assault victims is not uncommon is not within the knowledge of the average juror. Thus, because [the expert's] testimony required 'specialized knowledge' it is properly characterized as expert testimony." (Emphasis deleted.) *Id.* at ¶50, quoting *State v. Solether*, 6th Dist. Wood No. WD07053, 2008-Ohio-4738, ¶65-69. *See also State v. Carter,* 8th Dist. Cuyahoga No. 104874, 2018-Ohio-2238, ¶25, quoting *State v. Stowers*, 81 Ohio St.3d 260-262-63 (1998) ("[A]n expert may provide testimony that supports 'the truth of the facts testified to by the child, or which assists the fact finder in assessing the child's veracity'"); *State v. Thompson*, 8th Dist. Cuyahoga No. 99846, 2014-Ohio-1056, ¶21 (finding that a SANE nurse's testimony comported with Evid.R. 702 and 703; thus the trial court did not err in allowing her to testify); *State v. Gardner*, 8th Dist. Cuyahoga No. 107573, 2019-Ohio-1780, ¶41-46 (finding no error in admitting the testimony of a SANE nurse on "blunt force trauma" and that the absence of vaginal injuries is "common" in sexual assault).

{¶70} Mr. Stuart's third assignment of error is without merit.

## Motion to Suppress

{¶71} In Mr. Stuart's fourth assignment of error, he contends the trial court erred in denying his motion to suppress because the Mentor Police Department interview was in reality a custodial interrogation where he did not validly waive his *Miranda* rights and where he requested to speak with his attorney multiple times.

{¶72} We give due deference to the trial court's assignment of weight and inferences drawn from the evidence when ruling on a motion to suppress on appeal. (Citations omitted.) *State v. Starcovic*, 11th Dist. Portage No. 2007-P-0081, 2008-Ohio-2758, ¶10.

21

{¶73} Thus, appellate review of a motion to suppress presents a mixed question of law and fact. (Citations omitted.) *Id.* at ¶11. "The appellate court must accept the trial court's factual findings, provided they are supported by competent, credible evidence. * * * Thereafter, the appellate court must independently determine whether those factual findings meet the requisite legal standard." *Id.*, quoting *State v. Wilson,* 11th Dist. Ashtabula No. 2007-A-0044, 2007-Ohio-6557, ¶12, citing *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, ¶8. We review the trial court's application of the law de novo. *Id.,* citing *Wilson* at ¶12.

{¶74} "In *Miranda* [*v. Arizona*, 384 U.S. 436], at 444, * * * the United States Supreme Court established procedural safeguards for securing the privilege against self-incrimination guaranteed by the Fifth Amendment to the United States Constitution. The Fourteenth Amendment to the United States Constitution makes the privilege against self-incrimination applicable to a witness in a state proceeding." *Cleveland v. Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, ¶8, citing *Malloy v. Hogan*, 378 U.S. 1, 3 (1964). "A similar privilege is recognized in Article I, Section 10 of the Ohio Constitution." *Id.*

{¶75} "What are now commonly known as *Miranda* warnings are intended to protect a suspect from the coercive pressure present during a custodial interrogation." *Id.* at ¶9, citing *Miranda* at 469. "A custodial interrogation is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Id.,* quoting *Miranda* at 444. "If a suspect provides responses while in custody without having first been informed of his or her *Miranda* rights, the responses may not be admitted at trial as evidence of guilt." *Id.*, quoting *Miranda* at 479. "Any statement, question or remark which is 'reasonably likely

22

to elicit an incriminating response' is an interrogation." *State v. Knuckles*, 65 Ohio St.3d 494, 495 (1992), quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

{¶76} A review of the trial court's findings of fact and the hearing transcript on the motion to suppress reveals that Mr. Stuart was voluntarily at the police station to make a missing person report because J.S. did not come home after school. He willingly agreed to interview with the detectives. When the interview began, Detective Petro gave Mr. Stuart a written *Miranda* rights form and informed him of his rights. He asked her if he needed to call his attorney, and she replied it was entirely up to him. Mr. Stuart called his attorney and left a message when there was no answer. As he was attempting to reach his attorney, he began to speak to Detective Petro without any prompting and continued to answer her questions.

{¶77} For the first 45 minutes of the interview (which lasted just a little over one hour), he spoke to the detectives willingly and freely about J.S., why she might be missing, and the "twenty minute" phone conversation he had with her when she called him while he was at the station. During that time, Mr. Stuart was able to and constantly used his cellphone for calls and texts. He received a phone call from his wife, exchanged text messages with her, and attempted to call his attorney. At no point did he assert an unequivocal and unambiguous request to speak with his attorney and stop the interview. Nothing in the actions or questioning by police gave the impression he was not free to leave at any time and or that he was under arrest. Indeed, he gave no indication that he was under the impression he was under investigation until the questioning turned to J.S.'s allegations.

23

**{¶78}** After approximately 45 minutes, Detective Petro advised Mr. Stuart about the alleged sexual assault and that she had information he had touched J.S. in an inappropriate and sexual manner. Mr. Stuart replied, "I think I need my attorney." She asked Mr. Stuart more questions to which Mr. Stuart stated that he loved his daughter and wanted his attorney. At that point, the interview stopped, Detective Petro ceased asking questions, and Mr. Stuart attempted to reach his attorney once more, leaving him another message. Detective Petro advised Mr. Stuart that if he wanted to speak further, she would be happy to talk to him. Detective Petro testified during the motion to suppress hearing that she did not decide to arrest Mr. Stuart until the end of the interview.

**{¶79}** "It is well-established that *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him in custody. *Oregon v. Mathiason* (1977), 492 U.S. 492, 494 * * *. Similarly, the *Edwards* rule applies only if the accused invokes his right to an attorney *while in custody. United States v. Harris* (S.D.Ohio 1997), 961 F.Supp. 1127, 1135; *Minnesota v. Murphy* (1984), 465 U.S. 420, 424, * * * at fn. 3; *State v. Fry* (1988), 61 Ohio App.3d 689 * * *; *State v. Meyers* (Sept. 28, 2001), Allen App. No. 1–10–48, [2011-Ohio-3341].

**{¶80}** "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' *California v. Beheler* (1983), 463 U.S. 1121, 1125 * * *. 'Under this standard, a suspect obviously is in custody if he is formally placed under arrest prior to interrogation. Where the suspect has not been formally arrested, the restraint on the suspect's freedom of movement must be significant in order to constitute custody.'

24

*State v. Staley* (May 8, 2000), Madison App. No. CA99–08–019, [2000 WL 554512], at [*]7.

{¶81} "While '[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime[,]' a noncustodial situation is not converted into a custodial situation simply because questioning takes place in a police station. *Mathiason,* 429 U.S. at 495 * * *. Rather, the initial determination of whether an individual is in custody, for purposes of *Miranda,* depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. *Stansbury v. California* (1994), 511 U.S. 318, 323–324 * * *.

{¶82} "Thus, 'a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda.*' *Id.* at 324 * * *. 'An officer's knowledge or beliefs may bear upon the custody issue, [however], if they are conveyed, by word or deed, to the individual being questioned.' *Id.* * * *

{¶83} "Yet, '[t]hose beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her "freedom of action ." * * * Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest.' *Id.*" *State v. Coleman*, 12th Dist. Butler No. CA2001-10-241, 2002 WL 745322, *4-5 (Apr. 29, 2002).

25

{¶84} The trial court found that Mr. Stuart was not in custody at the time he was interviewed by the Mentor detectives. Mr. Stuart was never prevented from leaving, he spoke freely to the detectives, and never attempted to assert his right to counsel until the end of the interview when the questioning turned to J.S.'s allegations.

{¶85} Simply because Mr. Stuart was given *Miranda* warnings does not convert a noncustodial setting into a custodial interrogation. In an apposite case cited by the trial court, *Coleman*, *supra,* the Twelfth District Court was confronted with a similar situation in which *Miranda* warnings were given as a pretext to an interview with a suspect. The appellant in that case was also at the station voluntarily, spoke freely, did not express an unequivocal right to his attorney, was not under arrest, and was told he could leave at any time. *Id.* at *4.

{¶86} In determining this did not convert the police investigatory interview into a custodial interrogation, the court aptly remarked that "[w]e are mindful that *Miranda* warnings were nevertheless given to Coleman. However, the mere giving of *Miranda* warnings by a law enforcement officer does not convert a noncustodial setting into a custodial setting. See *United States v. Owens* (C.A.5, 1970), 431 F.2d 349. 'The precaution of giving *Miranda* rights in what is thought could be a non-custodial interview should not be deterred by interpreting the giving of such rights as a restraint on the suspect, converting a non-custodial interview into a custodial interrogation for *Miranda* purposes.' *United States v. Lewis* (C.A.6, 1977), 556 F.2d 446, 449. It follows then that the *Edwards* rule did not apply and the detectives were not required to cease the interview and provide Coleman with an attorney." *Id.* at *5.

26

{¶87} As in *Coleman*, we agree with the trial court that Mr. Stuart was not in custody or deprived of his freedom in any significant way. As a result, *Miranda* warnings were not required. *Id.* Therefore, his motion to suppress was properly denied.

{¶88} Mr. Stuart's fourth assignment of error is without merit.

### Sufficiency of the Evidence

{¶89} In Mr. Stuart's fifth assignment of error, he argues the state failed to provide sufficient evidence to establish beyond a reasonable doubt all elements of the charged offenses because the testimony of the victim was insufficient due to her incredibility and untruthfulness.

{¶90} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Hope*, 11th Dist. Trumbull No. 2018-Ohio-0053, 2019-Ohio-2174, ¶44, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶91} A sufficiency challenge requires this court to review the record to determine whether the state presented evidence on each of the elements of the offense. *Id.* at ¶45, citing *State v. Muncy*, 11th Dist. Ashtabula No. 2011-A-0066, 2012-Ohio-2830, ¶13. This test involves a question of law and does not permit us to weigh the evidence. *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

27

{¶92} We note at the outset that Mr. Stuart failed to identify which element of which conviction the state failed to prove, instead challenging the lack of corroborating and/or physical evidence and claiming that J.S.'s testimony alone is not sufficient.

{¶93} Credibility is a question concerning the weight, rather than the sufficiency, of the evidence. (Citations omitted.) *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶79. Further, the testimony of one witness is sufficient if it meets all the elements of the crime charged. "[C]ourts have consistently held that testimony, if believed, is sufficient to prove each element of the offense of rape." *State v. Blankenship,* 8th Dist. Cuyahoga No. 77900, 2001 WL 1617225, *4 (Dec. 13, 2001), citing *State v. Lewis*, 70 Ohio App.3d 624, 638 (4th Dist.1990). There is no requirement that a rape victim's testimony be corroborated as a condition precedent to conviction. *Id.*, citing *Lewis,* citing *State v. Love*, 49 Ohio App.3d 88, 91 (1st Dist.1988), and *State v. Gingell*, 7 Ohio App.3d 364, 365 (1st Dist.1982).

{¶94} With respect to sufficiency of the evidence, "'sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *Thompkins* at 387, quoting Black's Law Dictionary 1433 (6th Ed.1990); *see also* Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Id.,* citing *State v. Robinson*, 162 Ohio St. 486 (1955).

{¶95} Thus, the question is not whether the victim's testimony was credible but whether it was legally sufficient to sustain the jury's verdict. A review of J.S.'s testimony

28

reveals that she recounted two instances where Mr. Stuart digitally penetrated her vagina and another instance where he anally penetrated her with his penis and held her down while he did so. J.S. also testified as to Mr. Stuart's grooming and manipulation behaviors, which established a pattern of conduct and fear, that consisted of forcing her to view pornography by holding her head, snuggling and cuddling, and making inappropriate and sexual comments. This testimony alone, corroborated by Detective Petro and the SANE nurse expert, is legally sufficient to sustain convictions of rape, sexual battery, kidnapping, and menacing by stalking.

{¶96} Mr. Stuart's fifth assignment of error is without merit.

**Manifest Weight**

{¶97} In Mr. Stuart's sixth assignment of error, he contends his convictions are against the manifest weight of the evidence for the same reasons he contends the evidence was insufficient. Thus, he argues his conviction was not supported by competent, credible evidence because the victim's testimony lacked credibility, was self-serving, and contradicted her own former versions of the events.

{¶98} "When reviewing a claim that a judgment was against the manifest weight of the evidence, an appellate court must review the entire record, weigh both the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that a new trial must be ordered." (Citations omitted.) *State v. Buckley*, 11th Dist. Lake No. 2018-L-118, 2019-Ohio-3991, ¶61. *See also Thompkins* at 387.

29

{¶99} "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against a conviction. * * * The role of the appellate court is to engage in a limited weighing of the evidence introduced at trial in order to determine whether the state appropriately carried its burden of persuasion. * * * The reviewing court must defer to the factual findings of the trier of fact as to the weight to be given to the evidence and credibility of witnesses." (Citations omitted.) *Id.* at ¶62.

{¶100} As noted above, the state provided legally sufficient evidence to support Mr. Stuart's convictions for rape, kidnapping, sexual battery, and menacing by stalking. The jury was free to believe either the testimony of the victim, the police officers, including Detective Petro, J.S.'s social worker from LCJFS, and the SANE expert nurse, all of whom defense counsel cross-examined, or the testimony of Mr. Stuart, his wife, several character witnesses, and a private investigator who investigated the Stuarts' home.

{¶101} "It is well settled that when assessing the credibility of witnesses, '[t]he choice between the credibility of witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact.' * * * Furthermore, if the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict." (Citations omitted.) *Id.* at ¶65.

{¶102} Mr. Stuart's sixth assignment of error is without merit.

## Speedy Trial

{¶103} In Mr. Stuart's final assignment of error, he contends the trial court erred in denying his motion to discharge for violation of his right to a speedy trial, after taking 1,564 days to rule on his motion to suppress.

30

{¶104} The Supreme Court of Ohio has stated "R.C. 2945.71 *et seq.*, constitute a rational effort to enforce the constitutional right to a public speedy trial of an accused charged with the commission of a felony or a misdemeanor and shall be strictly enforced by the courts of this state." *State v. Gaston*, 11th Dist. Lake No. 2017-L-109, 2018-Ohio-4575, ¶29, quoting *State v. Pachay*, 64 Ohio St.2d 218 (1980), syllabus. "[F]or purposes of bringing an accused to trial, the statutory speedy trial provisions of R.C. 2945.71, *et seq.*, and the constitutional guarantees found in the United States and Ohio Constitutions are coextensive." *Id.*, quoting *State v. O'Brien*, 34 Ohio St.3d 7, 9 (1987).

{¶105} "A criminal defendant, however, may waive his or her constitutional right to a speedy trial, provided such waiver is knowingly and voluntarily made." *Id.* at ¶30, citing *Barker v. Wingo*, 407 U.S. 514, 529 (1972). "Similarly, a defendant, or his or her counsel, may validly waive the speedy trial provisions of R.C. 2945.71, *et seq.*" *Id.*, citing *State v. McBreen*, 54 Ohio St.2d 315 (1978). "It therefore follows that 'a knowing, voluntary, express written waiver of an accused's statutory speedy trial rights may equate with a waiver of the coextensive constitutional rights, at least for the time period provided in the statute.' *O'Brien, supra*. 'Following an express, written waiver of unlimited duration by an accused of his right to a speedy trial, the accused is not entitled to a discharge for delay in bringing him to trial unless the accused files a formal written objection and demand for trial, following which the state must bring the accused to trial within a reasonable time.'" *Id.*, quoting *O'Brien* at paragraph two of the syllabus.

{¶106} Mr. Stuart knowingly and voluntarily filed a written waiver of his constitutional and statutory rights to a speedy trial, reserving only the right to challenge pre-arrest and pre-charges. While the state filed several motions to set a date for trial

and/or a status conference, Mr. Stuart never formally demanded that a trial date be set, nor did he file a motion to withdraw his waiver.

{¶107} Because Mr. Stuart's written waiver was knowingly and voluntarily made and was of unlimited duration and he did not object and demand a trial, pursuant to *O'Brien*, the speedy trial provisions in R.C. 2945.71 *et seq.*, do not apply. The trial court did not err when it concluded appellant was not entitled to discharge, pursuant to R.C. 2945.73(B). *See Gaston* at ¶32.

{¶108} "In *Barker, supra*, the United States Supreme Court 'set forth a balancing test that considers the following factors to determine whether trial delays are reasonable under the Sixth and Fourteenth Amendments to the United States Constitution: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."'" *Id.* at ¶34, quoting *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, ¶38, quoting *Barker* at 530.

{¶109} Construing Mr. Stuart's motion to discharge as a formal withdrawal of his waiver, the trial court properly applied the *Barker* factors. The trial court found that the length of the delay was only 34 days between Mr. Stuart's withdrawal of his speedy trial waiver and the date set for trial. We agree this was not prejudicial, especially in light of the fact that the defense indicated that it would not be prepared to defend the case by that date. In fact, the defense filed a motion for a continuance, which the court granted.

{¶110} Mr. Stuart contends that he suffered prejudice because by the time the case was tried, the victim reached the age of majority. But Mr. Stuart fails to state how the victim reaching the age of majority prejudiced his case or deprived him access to witnesses and evidence. We agree with the state and the trial court that Mr. Stuart

32

errantly relies on the time period between the motion to suppress hearing and the court's subsequent denial of that motion when making this argument and that the relevant time period is between the filing of his motion to discharge and the date set for trial.

{¶111} Finding the trial court properly denied Mr. Stuart's motion to discharge because his speedy trial rights were not violated, Mr. Stuart's seventh assignment of error is without merit.

{¶112} Based on the foregoing, the judgment of the Lake County Court of Common Pleas is affirmed.

CYNTHIA WESTCOTT RICE, J.,

THOMAS R. WRIGHT, J.,

concur.