[Cite as *State v. McCleery*, 2022-Ohio-263.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

STATE OF OHIO,

          Plaintiff-Appellee,

- v -

SCOTT STEVEN MCCLEERY,

          Defendant-Appellant.

CASE NO. 2021-T-0024

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2020 CR 00477

## O P I N I O N

Decided: January 31, 2022
Judgment: Affirmed

*Dennis Watkins*, Trumbull County Prosecutor, and *Ryan J. Sanders*, Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481 (For Plaintiff-Appellee).

*Christopher Philip Lacich*, Roth Blair Roberts Strasfield & Lodge, 100 East Federal Street, Suite 600, Youngstown, OH 44503 (For Defendant-Appellant).

MATT LYNCH, J.

{¶1} Defendant-appellant, Scott Steven McCleery, appeals from his convictions for Domestic Violence, Attempted Rape, and Felonious Assault, following a jury trial in the Trumbull County Court of Common Pleas. For the following reasons, we affirm the decision of the lower court.

{¶2} On August 26, 2020, the Trumbull County Grand Jury issued an Indictment, charging McCleery with Domestic Violence, a felony of the fourth degree, in violation of R.C. 2919.25(A); Rape, a felony of the first degree, in violation of R.C. 2907.02(A)(2); Attempted Rape, a felony of the second degree, in violation of R.C. 2923.02(A) and

2907.02(A)(2); two counts of Felonious Assault, felonies of the second degree, in violation of R.C. 2903.11(A)(2); and Disrupting Public Services, a felony of the fourth degree, in violation of R.C. 2909.04(A)(1).

{¶3} A jury trial was held on March 22-23, 2021. The following pertinent testimony and evidence were presented:

{¶4} K.R. testified that she dated McCleery from approximately April to July of 2020 and was living with him in a trailer home on July 2, 2020. On that date, K.R. asked McCleery to go out with K.R. and her friend, which request he denied. She described McCleery as acting "ignorant," and calling her names. She observed that they had been fighting over the past few weeks and he had become "more aggressive." K.R. and two girlfriends went to multiple bars that evening. She had one alcoholic beverage, a Twisted Tea, and shared one marijuana joint with her friends while driving to a bar. Throughout the night, McCleery called her 30 or 40 times and was "aggressive," "unpleasant," and used expletives because he was upset that she went out. During one call outside of a bar, K.R. used her speakerphone so others could hear him yelling and calling her names. A male acquaintance who was present, Cameron, asked "why would you talk to your girl like that?" McCleery became upset when he heard the male voice, called K.R. a "whore," and said "You're cheating on me."

{¶5} According to K.R., when she arrived home after 2 a.m., McCleery was outside, grabbed her by the hair, and dragged her up the steps into the home. Inside the residence, she observed that items were destroyed and moved around. She ran out of the house and drove her car to a nearby mall parking lot. She spoke on the phone with her mother, whom McCleery had called and informed they had been fighting. She then

2

spoke with McCleery and agreed to go home because he seemed calmer and promised not to put his hands on her. She entered the home, did not see McCleery, and went inside the bathroom. McCleery then "comes out of nowhere," ripped her phone out of her hand, and threw it in the toilet. She testified that McCleery "wiped" his fingers across her vagina on top of her underwear and made a statement implying she had sex with another man. K.R. testified that he grabbed her in a chokehold and shoved his fingers in her vagina. She screamed for him to stop, he did, and then he ripped off her underwear. She fell to the ground, and felt "something sharp by [her] butt." She then saw that McCleery had a claw hammer. She testified she was "not sure what he was trying to do with it" but it was "towards [her] thighs, up by [her] butt." She further stated: "I felt it by my – right by my vagina and my butt." K.R. squeezed her legs together and McCleery was trying to open them. She testified that she thought he was trying to "shove the hammer up [her]." When asked "was he trying?" she responded "yes." She testified that she was injured on her buttocks, calf muscle, and by her thighs. After repeatedly screaming for McCleery to stop, he backed up a little bit and she ran to the bedroom.

{¶6}   While K.R. ran to the bedroom, McCleery retrieved a steak knife from the kitchen. He stabbed the bedroom door and around her on the bed, coming within a few inches of her. He eventually fell asleep on the couch, at which time she went to a friend's house. She later went to her mother's house and her mother called the police. She went to the hospital for an exam and told the nurse she was not raped because she did not understand what this meant. According to K.R., at the hospital, she stated that McCleery put his fingers inside her, attempted to penetrate her with the hammer, and that the hammer "never got beyond my buttocks" and was "by my butt and butt cheek crease." In

3

her written statement to police, which her mother wrote for her because she was crying and shaking, she stated: "I thought he was shoving his fingers up my vagina and butt, then figured out he was using a hammer, the claw part."

{¶7} According to K.R.'s mother, K.R. arrived at her mother's house later that day and was "walking funny" and hyperventilated while telling her what happened with McCleery. The victim's mother had been with K.R. on the date of the incident and knew she had been arguing with McCleery. McCleery had called her early in the morning hours of July 3, stating K.R. was cheating on him and calling her expletives and K.R. called her mother around 3 a.m., crying and scared to go home. While K.R. was at her home, McCleery continued to call and she decided to call the police. In the following days, K.R.'s mother observed bruising on K.R.'s thighs and long red scratches "between her butt cheeks."

{¶8} Patrolman Tyce Gall of the Niles Police Department responded to the dispatch and encountered K.R., who was in tears and had "sort of a limp." He and other officers arrested McCleery at his residence, where he was hiding behind a mirror and inquired about the reasons for his arrest. Detective Anthony Roberts testified regarding photos that depicted the state of the residence, where puncture marks were found in the walls, the bedroom door, and the bed sheet. A pair of ripped underwear was also recovered.

{¶9} Recordings of phone calls made by McCleery while incarcerated were played, during which McCleery apologized to K.R. and stated that his conduct was due to excessive drinking that night.

{¶10} Lindsey Deetz, a forensic scientist at the Ohio Bureau of Criminal

4

Case No. 2021-T-0024

Investigation, testified that a vaginal swab was positive for acid phosphatase activity, which can demonstrate the presence of semen. The swab contained male DNA but she could not exclude or include McCleery as the contributor. She noted that "if there's no body fluid and it's just skin cells or transfer of some sort, it can be difficult, but not impossible, to find a DNA profile." DNA recovered from K.R.'s jaw was from a male, with McCleery excluded as the contributor. DNA swabs from the hammer head and handle were consistent with a mixture of K.R. and McCleery's DNA. On cross-examination, defense counsel inquired about whether the acid phosphatase could be caused by something other than semen and Deetz responded affirmatively, testifying that there was no semen in the sample provided.

{¶11} At the close of the State's case, McCleery moved for acquittal on all charges, which motion was denied.

{¶12} McCleery testified that he planned to go out with K.R. on the date of the offenses but declined to do so because she was rushing him and he did not want to go to bars. Because of this and another issue between the couple, he was "rude" to her as she left the residence. He called her many times while she was gone and she failed to pick up most of his calls. He testified that when she arrived home around 2 a.m., he yelled at her, asking who she had been with and why she failed to answer her phone. He grabbed her by her hair and brought her inside. According to McCleery, K.R. left the trailer and when he spoke with her on the phone again, he heard a man's voice. When she arrived home, he held a hammer to the small of her back and lifted her dress with the hammer to check whether she was wearing underwear. He also held her in a chokehold. He then lectured her about going out to drink when the two were trying to have a child. He stabbed

5

the bedroom door with the knife but did not stab the bed, although he admitted to trying to scare K.R. McCleery admitted that he had been drinking while she was gone and had tossed items around the trailer. He denied putting his fingers in her vagina.

{¶13} The jury found McCleery guilty of Domestic Violence, Attempted Rape, and Felonious Assault in relation to use of the hammer. McCleery was acquitted of Rape, Disrupting Public Services and Felonious Assault relating to the knife.

{¶14} A sentencing hearing was held on April 21, 2021. The court merged the offenses of Attempted Rape and Felonious Assault and the State elected to proceed on Attempted Rape for the purposes of sentencing. The court ordered McCleery to serve consecutive sentences of twelve months in prison for Domestic Violence and five to seven and one-half years for Attempted Rape.

{¶15} McCleery timely appeals and raises the following assignments of error:

{¶16} "[1.] The trial court erred and abused its discretion when it denied the defendant-appellant's Criminal Rule 29 motion and/or the verdicts convicting the defendant of Attempted Rape (Count 3) and Felonious Assault (Count 4) were based on evidence that was legally insufficient, or in the alternative, against the manifest weight of the evidence.

{¶17} "[2.] Trial counsel was ineffective for her failure to object to leading questions to the alleged victim, for allowing the state's forensic expert to retract a key point of beneficial evidence, and for failure to request a jury charge of 'false in one, false in all.'"

{¶18} In his first assignment of error, McCleery argues that his convictions for Attempted Rape and Felonious Assault are against the weight and sufficiency of the

6

evidence.

{¶19} "Pursuant to Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978), syllabus. "Thus, when an appellant makes a Crim.R. 29 motion, he or she is challenging the sufficiency of the evidence introduced by the state." (Citation omitted.) *State v. Hastings*, 11th Dist. Portage No. 2020-P-0014, 2021-Ohio-662, ¶ 23. In reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶20} Whereas "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997). "[A] reviewing court asks whose evidence is more persuasive—the state's or the defendant's?" *Id.* An appellate court must consider all the evidence in the record, the reasonable inferences, the credibility of the witnesses, and whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Citation omitted.) *Thompkins* at 387. "Since there must be

7

sufficient evidence to take a case to the jury, it follows that 'a finding that a conviction is supported by the *weight* of the evidence necessarily must include a finding of sufficiency.'" (Citation omitted.) *State v. Arcaro*, 11th Dist. Ashtabula No. 2012-A-0028, 2013-Ohio-1842, ¶ 32.

{¶21} As an initial matter, we need not consider sufficiency or manifest weight arguments as they relate to Felonious Assault since this merged into Attempted Rape for the purposes of sentencing. As this court has held, where allied offenses are merged and there is sufficient evidence on the offense for which the defendant is sentenced, errors relating to sufficiency and weight of the evidence on the count that is merged are harmless and need not be considered. *State v. Mugrage*, 11th Dist. Portage No. 2020-P-0066, 2021-Ohio-4136, ¶ 133; *State v. Whetstone*, 11th Dist. Lake No. 2015-L-114, 2016-Ohio-6989, ¶ 26.

{¶22} Pursuant to R.C. 2923.02(A): "No person, purposely or knowingly, when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." The Rape statute applicable here provides: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.02(A)(2). Sexual conduct is defined as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." R.C. 2907.01(A). "Attempted rape requires that the actor (1) intend to compel submission to sexual conduct by force or threat, and (2) commit some act that

8

'convincingly demonstrate[s]' such intent." (Citations omitted.) *State v. Davis*, 76 Ohio St.3d 107, 114, 666 N.E. 2d 1099 (1996).

{¶23} While McCleery challenges both the sufficiency and the weight of the evidence, he primarily takes issue with various credibility issues he alleges invalidate K.R.'s testimony, arguing that her testimony was inconsistent, "outlandish," and untruthful. Where a defendant argues the testimony implicating him is "contradictory and incredible," such contention "calls for an evaluation of the witnesses' credibility, which * * * is not proper on review for evidentiary sufficiency." *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79; *State v. Stuart*, 11th Dist. Lake No. 2018-L-145, 2020-Ohio-3239, ¶ 93 ("[c]redibility is a question concerning the weight, rather than the sufficiency, of the evidence"). Further, the victim's testimony alone, if believed, is sufficient to prove each element of the offense of rape. *Stuart* at ¶ 93. Thus, as long as there was testimony provided to support the elements necessary for Attempted Rape, issues regarding the consistency and credibility of this testimony are properly considered as a manifest weight challenge.

{¶24} Here, there was testimony provided that, if believed, could support an Attempted Rape conviction. To prove Attempted Rape, it was necessary to show that McCleery engaged in behavior that, if successful, would have resulted in sexual conduct submitted to by force and that he intended to compel such submission. K.R. testified that he placed a hammer between her buttocks, by her vagina and that he was trying to put the hammer "inside [her]," which conduct she attempted to prevent by closing and crossing her legs while screaming at him to stop. Placing the hammer near her vagina and trying to put it inside her, as she testified to, if accepted as true, demonstrated the

9

elements necessary for this crime. Her testimony was corroborated by other evidence, including witness testimony and photographs of her injuries, which included scratches and bruising on her thighs and buttock, and of the trailer. Since there is sufficient evidence to support the convictions, we will proceed to consideration of credibility issues as they relate to the weight of the evidence.

{¶25} We initially emphasize that "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan,* 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). "Since the jury is in the best position to assess credibility, we generally decline to second guess its credibility determinations." *State v. Tiggett*, 11th Dist. Trumbull No. 2018-T-0036, 2019-Ohio-1715, ¶ 34. The issues raised by McCleery do not warrant rejection of the jury's determination of witness credibility.

{¶26} McCleery contends that K.R.'s testimony should be discounted as untruthful "after a night of drinking and marijuana use." This argument ignores the entirety of the record and is contradictory to McCleery's own arguments that his testimony should have been believed rather than K.R.'s. The defendant would apparently have this court reject all of the victim's testimony where she indicated she had one alcoholic beverage and shared part of one marijuana joint a few hours before the assault, yet accept his self-serving testimony although he indicated in his phone call to the victim that he had 20 shots of alcohol and that the night was a "blur," and repeatedly stated he had only assaulted her because he was drunk. There was nothing in the record to indicate that the alcoholic beverage and marijuana consumed several hours before the assault rendered K.R. intoxicated or impacted her ability to recall or accurately describe the

10

Case No. 2021-T-0024

events.

{¶27} Although McCleery characterizes K.R.'s testimony as "outlandish," various details were corroborated through other evidence. Her description of McCleery ripping off her underwear was supported by the torn underwear discovered at the home, her statements about him stabbing objects in the bedroom were demonstrated through photos of the scene, both parties' DNA was on the head and handle of the hammer, McCleery's phone calls and text messages demonstrated remorse for events occurring on the night in question, K.R.'s injuries were consistent with the conduct described, and her fear and emotional reaction to the events were testified to by multiple witnesses. Further, it is certainly a possibility that the jury considered K.R.'s testimony not to be more "outlandish" than McCleery's story that he wielded a hammer for the purpose of lifting up K.R.'s dress to see if she was wearing underwear. His admission of this conduct demonstrates his irrational and aggressive state at the time of the assault. The jurors were in the best position to evaluate credibility in the face of the conflicting testimony. *Awan* at 123.

{¶28} McCleery also argues that K.R.'s version of events changed over time, emphasizing alleged differences in her description of how the hammer was used. While the description changed slightly from K.R.'s statements at the hospital and in her testimony, she was generally consistent in her statement that the hammer was on and around her buttocks and near her vagina. In the hospital she said the hammer "never got beyond my buttocks" and at trial she stated that it was "by my butt" and "in between my thighs." Although these statements differ slightly, they both demonstrate the general area where the hammer was. She never claimed that the hammer penetrated her but instead

11

that McCleery attempted to use it to do so while she used her legs to prevent his actions. While she did demonstrate some confusion regarding whether she was penetrated with McCleery's fingers, testifying that he did insert his fingers in her vagina, while in the written statement, she stated that she "thought" he was shoving his fingers in her vagina but then noticed his use of a hammer, it is evident the jury recognized this inconsistency given its acquittal of McCleery on the Rape charge. Contrary to his assertions, there is nothing in the record to demonstrate that the jurors were not "attentive."

{¶29} McCleery raises several other arguments regarding credibility which are either irrelevant or mischaracterized. For example, to the extent that McCleery argues that Deetz corroborated the argument that he did not insert his finger in K.R.'s vagina, thus establishing K.R.'s lack of credibility, her complete testimony was equivocal. While McCleery's DNA was not found from the vaginal swab, Deetz also testified that "if there's no body fluid and it's just skin cells or transfer of some sort, it can be difficult, but not impossible, to find a DNA profile." Also, while McCleery emphasizes Deetz's testimony as showing semen present on the vaginal swab, Deetz subsequently clarified this was not from semen and could be from another source of bodily fluid. Further, whether K.R. had a male's DNA on her face is irrelevant; this could come from multiple forms of contact with any male individual, K.R. did not describe the touching of her face being involved in the assault, and whether K.R. was with another man that night has no bearing on whether McCleery's conduct constituted Attempted Rape.

{¶30} To the extent that McCleery compares the credibility of his testimony with K.R.'s, his emphasis as to the truth of his statements is questionable. As noted above, he repeatedly stated that he was heavily intoxicated during the incident. His statements

12

that he did not use the hammer on the victim other than to place it on her back and to lift her dress and did not attempt to rape her are inconsistent with testimony and photographs of scratches and bruising on her legs and thighs. Although he testified he did not rip her underwear off her body, this is contrary to his statement in the recorded jail phone call and torn underwear was located at the scene and identified by the victim. In contrast, K.R.'s testimony was consistent with her documented injuries and the evidence at the scene. Although every detail given in her statements after the incident while showing signs of stress from the events may not have been precisely the same as her testimony, this does not render her testimony lacking in credibility such that this issue should be removed from the jury, particularly given the inconsistent and self-serving nature of the defendant's testimony. *State v. Sarge*, 5th Dist. Knox No. 21CA000014, 2021-Ohio-4379, ¶ 36 ("a jury is free to reject a defendant's self-serving testimony, and * * * doing so does not render a conviction against the manifest weight of the evidence").

{¶31} As a final note, in McCleery's brief, counsel emphasizes that the DNA found on K.R.'s jaw shows she may have been with another male, thereby supporting McCleery's testimony of the events of the evening "which led to his flawed decision to commit domestic violence." We emphasize that whether K.R. was with another man that evening and whether that led to McCleery's actions has no relevance. This provides no justification whatsoever for his actions, nor does the truth of whether she was with a man reflect on McCleery's credibility since both parties gave the same testimony regarding the presence of another male who made a statement to McCleery on K.R.'s phone. McCleery's actions were unjustified and veiled attempts to place blame on the victim are valueless.

Case No. 2021-T-0024

{¶32} The first assignment of error is without merit.

{¶33} In his second assignment of error, McCleery argues that trial counsel was ineffective by eliciting harmful testimony from an expert, failing to object to leading questions, and failing to request a "false in one, false in all" jury charge.

{¶34} To demonstrate ineffective assistance of counsel, a defendant must prove "(1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding." *State v. Madrigal*, 87 Ohio St.3d 378, 388-389, 721 N.E.2d 52 (2000), citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus. "There is a strong presumption that the attorney's performance was reasonable." *State v. Gotel*, 11th Dist. Lake No. 2006-L-015, 2007-Ohio-888, ¶ 10.

{¶35} First, McCleery argues that defense counsel was ineffective by failing to object to leading questioning of K.R. by the prosecution on direct examination, which "allowed the victim to recast her previous answers into a format of her and/or the State's choosing."

{¶36} "A leading question is 'one that suggests to the witness the answer desired by the examiner.'" (Citation omitted.) *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 138. "Leading questions should not be used on the direct

14

examination of a witness except as may be necessary to develop the witness' testimony." Evid.R. 611(C). However, "[b]ecause a trial court has broad discretion in allowing leading questions, counsel's decision not to object is within the realm of trial strategy." (Citation omitted.) *State v. Jones*, 2019-Ohio-2134, 137 N.E.3d 661, ¶ 59 (10th Dist.); *see also State v. Jackson*, 92 Ohio St.3d 436, 449, 751 N.E.2d 946 (2001) (finding a lack of ineffective assistance for failure to object to leading questions, since "it is within the trial court's discretion to allow leading questions on direct examination" and due to the failure to demonstrate the result would have been different but for trial counsel's alleged ineffectiveness).

{¶37} In McCleery's argument, he does not point to specific leading questions to which counsel should have objected. It is accurate that throughout K.R.'s testimony, the prosecutor asked questions that directed the general flow of the testimony, followed-up seeking additional detail, and may have sought specific information. However, in the absence of specific instances where McCleery believes objections were required, we decline to address any particular questions as it is not the job of this court to root out arguments that support an assignment of error. *State v. Turner*, 11th Dist. Lake No. 2020-L-088, 2021-Ohio-1921, ¶ 23. Nonetheless, a review of the direct examination of K.R. does not demonstrate that, had defense counsel objected, the testimony or outcome would have been different such that McCleery suffered prejudice. *See State v. Lewis*, 11th Dist. Lake No. 2012-L-074, 2013-Ohio-3974, ¶ 164 ("[e]ven if an objection should have been made, the failure did not alter the outcome of the trial based on the entirety of the record"). As has been observed, if defense counsel had objected to any potentially leading questions, "the state could have simply rephrased" the questions following the

15

objection. *Jones* at ¶ 60.

{¶38} Next, McCleery argues that counsel's cross-examination of Deetz regarding the absence of sperm in the vaginal swab elicited information that was harmful to his defense, causing Deetz to "recant" her prior statement that there was another man's semen present and there was no basis to proceed with this line of questioning.

{¶39} "The scope of cross-examination clearly falls within the ambit of trial strategy." *State v. Hoffner,* 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 45. "[D]ebatable trial tactics do not establish ineffective assistance of counsel." (Citation omitted.) *State v. Johnson,* 11th Dist. Ashtabula No. 2009-A-0050, 2010-Ohio-3046, ¶ 37. Given this great deference to trial counsel in developing trial strategy, we do not find ineffective assistance of counsel. Here, during direct examination, Deetz testified that acid phosphatase may be indicative of the presence of semen, but did not elaborate. Defense counsel inquired further about whether semen was found in the vaginal swab, ultimately eliciting a statement from Deetz that the acid phosphatase did not demonstrate semen was present. While this questioning may have elicited information not necessary or particularly helpful to McCleery's defense, it could have been part of a strategy to emphasize that his DNA was not present and to further clarify the issues of DNA for the jury. Furthermore, as addressed above, demonstrating whether K.R. had been with another man did not impact McCleery's credibility as he asserts. Both parties agreed that a man had spoken on the phone, McCleery heard it, and this caused him to be suspicious that she was cheating. Confirming that she had done so would not give McCleery more credibility nor was it relevant for the purposes of determining that he committed the criminal acts in question. For these reasons, we find neither ineffectiveness of counsel

16

nor prejudice. *See Arcaro*, 2013-Ohio-1842, at ¶ 23-24 ("[i]n the present matter, while some damaging information was elicited during defense counsel's cross-examination * * * we cannot say that this constituted ineffective assistance of counsel" since counsel was entitled to deference to his trial strategy).

{¶40} Finally, McCleery argues that defense counsel should have requested a "false in one, false in all" jury instruction in response to K.R.'s allegedly inconsistent testimony.

{¶41} A "false in one, false in all" instruction states that if a witness willfully lies about a material fact, the jury is "free to assume" that witness testified falsely about other matters. *Mikula v. Tailors*, 24 Ohio St.2d 48, 51, 263 N.E.2d 316, 325 (1970). It has been held that such an instruction is permissible, "if at all," when a witness has "made a consciously false statement about a material fact or circumstance." *Id.*; *State v. Mitchell*, 8th Dist. Cuyahoga No. 45014, 1983 WL 5738, *9 (Feb. 3, 1983). "Seemingly contradictory utterances of a witness do not, per se, establish a conscious falsity" and "[s]omething more must appear which will permit the jury reasonably to believe that perjury was committed." *State v. Rodriguez*, 6th Dist. Wood No. WD-08-011, 2009-Ohio-4059, ¶ 32, citing *Mikula* at 52. For example, where a witness testifies differently at two separate hearings, this alone does not require an instruction; rather, the record must contain an "implication of intentionally perjurious conduct." *Mitchell* at *9. It has been emphasized that the rule "is not absolute and often tends to defeat rather than promote the ascertainment of truth." *State v. Jones*, 10th Dist. Franklin No. 76AP-321, 1976 WL 190259, *2 (Oct. 5, 1976). The trial court can exercise its discretion to give such an instruction but, "[o]rdinarily, that extreme an approach is not taken, and the jury is

17

permitted to determine the credibility of the remaining testimony in light of the falsehood that has been pointed out." *Id.*

{¶42} McCleery fails to provide specific argumentation in support of the merits of giving such instruction. He points only to inconsistencies as addressed above, relating to the weight of the evidence. While the victim may have been partially inconsistent in her versions of the events, there is nothing in the record to indicate that she made a consciously or intentionally false statement about a material fact or perjured herself. Since the facts did not require such an instruction, counsel was not ineffective for failing to request this instruction be given, nor did prejudice result. The instruction given to the jurors advised them that they are free to believe all or part of any witness's testimony and to determine what weight to assign their testimony when evaluating credibility. This instruction was proper under the circumstances.

{¶43} Within this assignment of error, McCleery also argues that the trial court erred in failing to give this instruction, recognizing the applicability of a plain error standard due to counsel's failure to raise this issue. Given the foregoing, we find no error in the failure to give such an instruction, plain or otherwise.

{¶44} The second assignment of error is without merit.

{¶45} For the foregoing reasons, McCleery's convictions for Domestic Violence, Attempted Rape, and Felonious Assault in the Trumbull County Court of Common Pleas are affirmed. Costs to be taxed against appellant.

MARY JANE TRAPP, J.,

JOHN J. EKLUND, J.,

concur.

18

Case No. 2021-T-0024